**UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| SERVICOM LLC, | : | Case No. 18-31722 (AMN) |
| JNET COMMUNICATIONS LLC, and | : | Case No. 18-31723 (AMN) |
| VITEL COMMUNICATIONS LLC, | : | Case No. 18-31724 (AMN) |
| | : | |
| Debtors. | : | (Joint Administration Requested) |
| SERVICOM LLC, | : | |
| JNET COMMUNICATIONS LLC, and | : | |
| VITEL COMMUNICATIONS LLC | : | |
| | : | |
| Movants, | : | |
| | : | |
| v. | : | |
| | : | |
| CORAL CAPITAL SOLUTIONS LLC, | : | |
| CT CORPORATION SYSTEM, AS | : | |
| REPRESENTATIVE, VFI KR SPE I, LLC, | : | |
| GROWTHFUNDING EQUIPMENT FINANCE, | : | |
| And EVERLASTING CAPITAL CORP., | : | |
| | : | |
| Respondents. | : | |

**MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO
USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION AND
<u>(III) APPROVING SALE OF ACCOUNTS RECEIVABLE</u>**

ServiCom LLC ("ServiCom"), JNET Communications LLC ("JNET"), and Vitel Communications ("Vitel," together with ServiCom and JNET, the "Debtors"), for their motion pursuant to §§ 361, 362 and 363 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1530 ("Bankruptcy Code"), and Federal Rules of Bankruptcy Procedure 4001 and 9014, (a) for an order authorizing them to use cash collateral and granting adequate protection on a preliminary basis, (b) authorizing them to sell their accounts receivable in accordance with their pre-petition factoring

arrangement,[1] (c) scheduling and establishing notice procedures for a final hearing on this motion, (d) after holding such final hearing, for an order authorizing them to use cash collateral and granting adequate protection on a final basis, and (e) granting related relief, respectfully state:

1. On October 19, 2018 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Pursuant to Bankruptcy Code §§ 1107(a) and 1108, the Debtors continue to operate their businesses and manage their properties, affairs, and assets as debtors-in-possession. No trustee, examiner, or committee has been appointed in these cases.

2. The Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this Court for these cases and this motion pursuant to 28 U.S.C. §§ 1408 and 1409, respectively. The basis for the relief requested herein is Bankruptcy Code §§ 105, 361, 363, 503 and 507 and Federal Rules of Bankruptcy Procedure 4001 and 9014.

3. JNET is a Delaware limited liability company that provides overall management and administrative functions as the holding company for ServiCom and Vitel. JNET, in conjunction with its subsidiaries, constitute a full service, outsource provider of customer contact management and telecommunication infrastructure fulfillment services to Fortune 1000 companies. JNET was founded in July 2003 by David Jefferson, a former senior executive of Comcast Corporation and AT&T Corporation. JNET has grown significantly since its founding. JNET realized on a consolidated basis $80 million in revenues in 2017 and is on track to generate revenues of $70 million in 2018 largely from its two separate but complementary subsidiaries,

---

[1] Such request by the Debtors assumes an adjudication by this Court that the Debtors' sale of accounts receivable prior to the Petition Date constitute a "true sale." To the extent this Court does not made such a determination, then the Debtors' request for the use of cash collateral made herein shall incorporate the proceeds of all pre-petition accounts receivable.

ServiCom and Vitel. As of the Petition Date, JNET independently employs approximately 31 people.

4. ServiCom is a Delaware limited liability company that is wholly owned by JNET. ServiCom provides a comprehensive suite of call center outsourcing services to a broad range of industries. The customer care and telemarketing capabilities include inbound calls, outbound calls, internet sales, customer service, customer retention, customer affairs, market research, help desk, lead management, interactive services, and fulfillment services. ServiCom primarily serves clients in the insurance, utility and telecom industries. ServiCom maintains its principal assets and operates a call center location in Milford, CT. ServiCom also operates call center locations in Machesney Park, IL and Sydney, NS (Canada). As of the Petition Date, ServiCom employs approximately 800 people.

5. Vitel is a Delaware limited liability company that is also wholly owned by JNET. Vitel provides installation and construction related services and other customer management services to cable and telecom companies, including installation of cable and telephone equipment, high speed data and digital phone installation, multiple dwelling unit construction and customer save services. Vitel currently operates in Georgia, Maryland, New Jersey, Ohio and Texas. As of the Petition Date, Vitel employs approximately 25 people.

6. Unfortunately, the Debtors suffered significant losses in 2017 and 2018 year-to-date attributable to multiple factors.

7. First, ServiCom expanded its operations in anticipation of significant additional business. Specifically, early in 2016, ServiCom was awarded a significant inbound calling program. This required the addition of a third call center in Illinois which opened in September 2016. The new program and facility required a tremendous investment in equipment,

infrastructure, and personnel. This expansion also took much more time than anticipated—and with delay came further costs. This work had the potential to be ServiCom's single most profitable program. Unfortunately, the call volume anticipated from the customer did not materialize at the rate they projected, resulting in negative cash flows.

8. Another customer decided in 2017 to discontinue its one type of inbound customer service work and replace it with another. This is not an issue in and of itself. However, the pull back of the former work happened at a much faster pace than the substitution of the new work. The significant drop in revenue experienced during the phase out produced cash flows insufficient to cover the cost of the call center dedicated to this work. Then, in 2018, the customer cancelled the second program altogether leaving ServiCom with a large idle investment.

9. As for Vitel, the overall shrinking of the residential cable industry significantly decreased revenue. In particular, starting in late 2017, one cable company reduced the amount of fulfillment work assigned to subcontractors like Vitel by 40%. This had a significant adverse impact on cash flow. In response, Vitel took the necessary steps in 2018 to right size its operations in light of these changes only to see a further dip in revenue awarded. The 2018 construction work from new contracts was also delayed from Q2 to Q3, compounding the overall losses suffered.

10. JNET and its subsidiaries have responded to this contraction by closing a number of facilities and otherwise reducing the size of its business and operations which has resulted in a significant reduction in its overhead and personnel costs. Their overall enterprise and infrastructure are now consistent with the volume of work they currently have and reasonably anticipate having for the foreseeable future. Unfortunately, there exists significant unpaid expansion costs, liabilities arising from the subsequent downsizing of its operations, and other resulting financial challenges. These circumstances have also placed a tremendous burden on JNET's and its subsidiaries'

working capital. Thus, JNET, ServiCom and Vitel seek bankruptcy relief under Chapter 11 so they can focus on their going forward business and return to profitability, and address their liabilities.

11. By this motion, the Debtors seek (a) the scheduling, pursuant to Federal Rule of Bankruptcy Procedure 4001, of a preliminary hearing on this motion (the "Interim Hearing") within three days of the commencement of these Chapter 11 cases; (b) at the Interim Hearing, the entry of an interim order in the form attached hereto as **Exhibit A** (the "Interim Order") authorizing the Debtors to use cash collateral in accordance with the budget annexed hereto as **Exhibit B** (the "Budget"), granting adequate protection to parties claiming an interest in the Debtors' cash collateral, and authorizing the sale of accounts receivable in accordance with the Factoring Agreement appended hereto as **Exhibit C**; (c) the scheduling, pursuant to Federal Rule of Bankruptcy Procedure 4001, of a final hearing on this motion (the "Final Hearing") within approximately twenty-one days of the commencement of these Chapter 11 cases; (d) the establishment of certain notice procedures for the Final Hearing; and (e) at the Final Hearing, the entry of a final order (the "Final Order"; together with the Interim Order, the "Cash Collateral Orders") authorizing the Debtors to use cash collateral in accordance with the Budget, granting adequate protection to parties claiming an interest in the Debtors' cash collateral, and authorizing the Debtors' sale of its accounts receivable.

12. The Debtors' primary source of funding is Coral Capital Solutions LLC ("Coral Capital"). The two funding facilities entered into with Coral Capital are as follows:[2]

---

[2] The Debtors provide the foregoing for informational purposes only and does not admit any factual or legal matter, and expressly reserves any and all rights, interests, claims and defenses with respect to thereto.

a. <u>Factoring Agreement</u>.  Coral Capital and the Debtors are parties to that certain "Factoring Agreement" dated as of October 17, 2011 (the "<u>Factoring Agreement</u>") and appended hereto as **Exhibit C**.  In summary, the Factoring Agreement provides as follows:

(i) Each of the Debtors agreed to sell and assign to Coral Capital, and Coral Capital agreed to purchase from each of the Debtors, certain accounts arising from such Debtor's sale of goods or rendition of services to such Debtor's customers located in the United States and Canada (collectively, the "<u>Receivables</u>"), subject to all terms and conditions contained in the Factoring Agreement.

(ii) From time to time, the Debtors may submit to Coral Capital a written request that it purchase the Receivable listed therein, and in response thereto, Coral Capital may provide the Debtors a schedule of Receivables that it elects to purchase.

(iii) The "Purchase Price" for such "Approved Receivables" shall be the "Net Amount" (all as defined therein), payable in two installments.  The first, the "Advance," is paid on the business day immediately following the approval date in an amount equal, generally to up to 85% of the "Net Amount" of such approved Receivables.  The second payment is paid by Coral Capital to the Debtors three business days after the day on which payment of the approved Receivables is received by Coral Capital and equals any excess payment received by Coral Capital after reimbursement for its "Advance" and certain other authorized deductions.

(iv) In order to secure the payment and performance of the "Obligations" (as defined in the Factoring Agreement), Section 6.1 of the Factoring Agreement contains a grant by Debtors to Coral Capital of a continuing security interest in and

6

right of setoff with respect to, and assigned to Coral Capital, all right, title and interest in and to essentially all of such Debtor's now existing and future personal property, including the following: accounts (including the Receivables), chattel paper (including electronic chattel paper), general intangibles (including all payment intangibles and all other rights to payment), instruments, inventory, equipment, documents and investment property, including, without limitation, any claims for tax refunds from any governmental authority due or to become due, all proceeds of letters of credit, all tort claims, all insurance proceeds, all trademarks and tradenames, all books and records, all deposit accounts, all computer programs, software, licenses and permits, whether now or hereafter existing or now owned or hereafter acquired and wherever located and all proceeds of the foregoing (collectively, the "Prepetition Collateral").

(v)     The term "Obligations" is defined to include all loans, advances, indebtednes, liabilities, obligations, debit balances, covenants and duties owing by a Debtor or any of the Debtor's subsidiaries or affiliates (whether arising thereunder or any "Other Agreement" (as defined therein)) to Coral Capital or Coral Capital's parent, subsidiary or affiliate of every kind and description (whether now or hereafter existing and whether arising under the Factoring Agreement, under any Other Agreement or otherwise), direct or indirect, absolute or contingent, due or to become due, including, without limitation, any indebtedness, liabilities or obligations owing by a Debtor to others which Coral Capital has acquired by assignment, participation or otherwise, and further including, without limitation, all interest, fees, charges, expenses,

7

    indemnification obligations and attorneys' fees for which a Debtor or any other person may be obligated under the Factoring Agreement or any Other Agreement.

Coral Capital purported to perfect its security interest in the Prepetition Collateral by recording UCC-1 financing statements with the offices of the Delaware Secretary of State (collectively, and as amended and/or continued from time to time the "<u>Financing Statements</u>").  The Financing Statements appear to confer upon Coral Capital a first-priority security interest in the Prepetition Collateral.  The Prepetition Collateral, therefore, may include all of the Debtors' "cash collateral" as that term is defined by Bankruptcy Code § 363(a) (the "<u>Cash Collateral</u>").

  b. <u>Secured Term Note</u>.  Separate and distinct from the Factoring Agreement, Debtors made, executed and delivered to Coral Capital that certain "Secured Term Note" dated November 21, 2017, in the original principal amount of $750,000; as such Secured Term Note amended and modified by that certain Amendment No. 1 to Secured Term Note, <u>inter alia</u>, increasing the principal balance of the loan to $1,000,000; and as such Secured Term Note was further amended and modified by that certain Amendment No. 2 to Secured Term Note, <u>inter alia</u>, extending the term of the Secured Term Note; and as such Secured Term Note was further amended and modified by that certain Amendment No. 3, <u>inter alia</u>, increasing the principal balance to $1,400,000 and extending the term of the Secured Term Note (collectively, the "<u>Secured Term Note</u>").  The Secured Term Note now evidences a term loan by Coral Capital to the Debtors in the original principal amount of $1,400,000 (the "<u>Secured Term Loan</u>"). In order to secure the payment and performance of the Secured Term Note, Section 5.2 of the Secured Term Note provides that the Obligations thereunder shall be secured by the "Collateral" (defined herein as the Prepetition Collateral) pledges pursuant to the Factoring Agreement.

c.  <u>Prepetition Coral Capital Loan Obligations</u>. As of the Petition Date, the Debtors were indebted and liable to Coral Capital: (a) under the Factoring Agreement, the outstanding balance due as of the Petition Date is approximately $9,600,000; (b) under the Secured Term Note, the principal amount of $1,400,000, plus accrued and unpaid interest thereon; and (c) all other fees, costs and additional charges due under the Factoring Agreement and the Secured Term Note, as the case may be (clauses (a), (b) and (c) herein are hereinafter referred to collectively as the "<u>Prepetition Coral Capital Loan Obligations</u>").

13.  CT Corporation System, As Representative ("CT"), VFI KR SPE I, LLC "(VFI"), GrowthFunding Equipment Finance ("GrowthFunding") and Everlasting Capital Corp. ("Everlasting Capital," and collectively, the "Other Lien Holders"), may assert an interest in some portion of the Cash Collateral. Their respective interests appear as follows:[3]

a.  CT filed UCC-1 financing statements against each of the Debtors and described as the alleged collateral essentially all of the Debtors' personal property. Despite diligent search, the Debtors have been unable to identify the particular entity with whom the Debtors allegedly entered into a security agreement for whom CT serves as the "Representative";

b.  ServiCom entered into a certain Master Lease Agreement (the "<u>VFI Agreement</u>"), dated April 6, 2016, with Varilease Finance, Inc. ("<u>Verilease</u>"), which provided, *inter alia*, that Verilease would lease certain equipment to ServiCom, including computer and office equipment, for the build-out of a call center that no longer operates. The VFI Agreement further provided that ServiCom's obligations under the VFI Agreement were secured by essentially all assets of ServiCom, which interest arose upon an Event of Default (as defined in the VFI Agreement).

---

[3] Once again, the Debtors provide the foregoing for informational purposes only and does not admit any factual or legal matter, and expressly reserves any and all rights, interests, claims and defenses with respect to thereto.

JNET entered into a Guaranty with Verilease, which provided that it guarantied the payment and performance of ServiCom under the VFI Agreement. Verilease assigned its interest in the VFI Agreement to VFI. VFI filed a Financing Statement on April 28, 2016, purporting to be a lien on essentially all the assets of ServiCom.

  c. ServiCom entered into a certain Master Lease Agreement (the "GrowthFunding Agreement") with GrowthFunding, dated July 26, 2016, which provided, *inter alia*, that GrowthFunding would lease certain computer equipment, furniture, and other materials needed for the opening of a new Canadian call center, which is still in operation. The GrowthFunding Agreement further provided that ServiCom's obligations under it were secured by what is essentially the leased property and its proceeds. GrowthFunding filed a financing statement purporting to perfect said interest on September 28, 2016.

  d. Everlasting Capital Corp. may claim a security interest by virtue of the grants contained four separate "merchant agreements" as follows: (1) Merchant Agreement dated July 25, 2018, in the amount of $325,000; (2) Revenue Purchase Agreement dated July 25, 2018, in the amount of $250,000; (3) Secured Merchant Agreement dated August 7, 2018, in the amount of $200,000, and (4) Secured Merchant Agreement dated August 4, 2018, in the amount of $325,000.  Upon information and belief, based upon the search of the filings with the Delaware Secretary of State, it does not appear that Everlasting Capital Corp. filed a UCC-1 financing statement with the Delaware Secretary of State, although the financing statements referenced above as having been filed by CT, may correspond to this security interest.

  14. The purpose of the use of the Debtors' Cash Collateral and sale of Receivables is to meet the Debtors' ongoing working capital and general business needs, which primarily consists of payroll, contractors, advertising/recruiting, telephone, equipment costs and utilities during the

Budget period. The Debtors have determined, in the exercise of their sound business judgment, that they require the use of their Cash Collateral and the sale of their Receivables, and that the terms of the Cash Collateral Orders will reasonably address the Debtors' requirements and constitute the best alternative under the circumstances.

15. The relief sought herein is necessary to the continued operation of the Debtor. If the Debtor is not granted the relief sought herein, including holding a hearing on a preliminary basis within approximately five (5) days of the Petition Date, then the Debtor will suffer irreparable harm in that it will be forced to cease operations, thereby destroying its going concern value for creditors of the estate, creating additional claims against the estate and eliminating vital jobs for its employees. The Debtors do not have any available sources of working capital and financing to carry on the operation of their businesses without the use of the Cash Collateral and the immediate and ongoing sale of its Receivables. The preservation and maintenance of the Debtors' businesses and their assets is necessary to maximize returns for all creditors and effectuate a plan of reorganization with respect to their remaining assets.

16. The duration of the use of cash collateral and sale of Receivables will be as provided in the Budget and set forth in the Cash Collateral Orders.

17. The Debtors are requesting that the Court grant the following pursuant and subject to sections 361, 362, 363, 503 and 507 of the Bankruptcy Code, as adequate protection for any diminution in value of the Prepetition Collateral resulting from the use of Cash Collateral, the Carve-Out (as defined below), the use, sale or lease of any other Prepetition Collateral, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, and further in exchange for the Debtors' continuing sale and Coral Capital's continuing purchase of Receivables on the terms and conditions set forth in the Factoring Agreement:

a.  To Coral Capital—

(1)  Pursuant to the Final Order only, the Debtors to pay to the Coral Capital interest at the contractual, non-default, rate of interest set forth in the Secured Term Note (the "Adequate Protection Payments"), all such amounts to be paid in accordance with the Budget.

(2)  To secure the Debtor's "Obligations" under the Factoring Agreement and to the extent of any diminution in value of the Prepetition Collateral resulting from any use of Cash Collateral, the use, sale or lease of any other Prepetition Collateral, and the imposition of the automatic stay pursuant to Section 362 of the Bankruptcy Code, Coral Capital to be granted valid, binding, enforceable and perfected senior replacement liens on and security interests in (the "Adequate Protection Liens") all property and assets of any kind and nature in which any of the Debtors have an interest, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising and all proceeds, products, rents and profits thereof, including, without limitation, all cash, accounts, chattel paper, deposit accounts, documents, equipment, general intangibles, instruments, investment property, letters of credit rights, vehicles, goods, accounts receivable, inventory, cash-in-advance deposits, real estate, machinery, intellectual property (including trademarks and trade names), licenses, causes of action, rights to payment, including tax refund claims, insurance proceeds and tort claims, and the proceeds, products, rents and profits of all of the foregoing (all of the foregoing together with the Prepetition Collateral, the "Postpetition Collateral"); provided, however, that the Postpetition Collateral shall not include any claims or causes of action arising under Chapter 5 of the

12

Bankruptcy Code or any similar state law ("Avoidance Actions"), or any proceeds thereof. The Adequate Protection Liens to have the following priorities:

(A) First Priority on Unencumbered Property. Subject to the Carve Out (defined hereinafter), a valid, binding, continuing, enforceable, fully perfected, non-voidable first priority lien on, and security interest in, all Postpetition Collateral of the type and kind that constitutes Coral Capital's Prepetition Collateral, in addition to all Postpetition Collateral that is not subject to valid, perfected, non-avoidable and enforceable liens in existence on or as of the Petition Date.

(B) Liens Junior to Certain Existing Liens. Subject to the Carve-Out, a valid, binding, continuing, enforceable, fully perfected non-voidable junior lien on, and security interest in, all Postpetition Collateral, that is subject to (x) valid, perfected and unavoidable senior liens in existence immediately prior to the Petition Date or (y) valid and unavoidable senior liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which prepetition security interests and liens in favor of Coral Capital is junior to such valid, perfected and unavoidable liens.

(C) Liens Senior to Certain Other Liens. The Adequate Protection Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and its estate under section 551 of the Bankruptcy Code or (B) any liens arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability

of the Debtors, or (ii) subordinated to or made pari passu with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise.

(3)     Superpriority Claims. To the extent of any diminution in value of the Prepetition Collateral in which the Debtors have an interest resulting from any use of Cash Collateral, the use, sale or lease of any other Prepetition Collateral, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, Coral Capital to be granted allowed superpriority claims senior to all other administrative expense claims and to all other claims, including administrative claims, arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, except as set forth below in the immediately succeeding section (the "Superpriority Claims"), which Superpriority Claims is to be payable from, and have recourse to, all of the Postpetition Collateral and proceeds thereof; provided, however, that such Superpriority Claims are to be subject to the Carve-Out (as defined below).

(4)     The Adequate Protection Liens and Superpriority Claims to be, in each case, (i) senior and prior, and prime, the Prepetition Liens and the Prepetition Obligations, but junior and subject only to (x) the Carve-Out and (y) all other valid, enforceable, perfected and unavoidable liens on all of the Debtors' assets and property in existence as of the Petition Date, or duly perfected thereafter, under section 546(b) of the Bankruptcy Code, which under applicable law would take priority over the Prepetition Liens, and (ii) effective as of the date of the entry of the Interim Order without any further action by the Debtors, the Lender or the Lender and without the necessity of the execution, filing or recordation of any financing statements, security agreements, lien applications or other documents.

(5)     Carve Out.  Notwithstanding any provision of the Factoring Agreement, the Secured Term Note, this Interim Order, or any other agreement, the Prepetition Liens, Adequate Protection Liens and Superpriority Claim (each as defined herein) shall be subject and subordinate in all respects to a carve-out for the following costs, fees and expenses (collectively, the "Carve-Out"): (i) the unpaid fees due and payable to the Clerk of the Court and the Office of the United States Trustee pursuant to 28 U.S.C. § 1930; and (ii) the unpaid fees, costs and expenses incurred by professionals retained by the Debtors up to a maximum of $150,000, or retained by any official committee pursuant to Bankruptcy Code § 327 or 1103 up to a maximum of $25,000, and only to the extent the fees, costs, and expenses of such professionals are allowed by the Court, provided, however, that neither Coral Capital's Cash Collateral nor the Carve-Out may be used, either directly or indirectly, for any services or expenses arising from or relating to the investigation, initiation or prosecution of any action: (i) contesting the validity, priority or extent of the prepetition or postpetition claims or liens asserted by Coral Capital, (ii) asserting claims or causes of action of any sort whatsoever (including, without limitation, avoidance claims) against Coral Capital or any person or entity affiliated with Coral Capital, (iii) preventing, hindering or delaying Coral Capital from enforcing any of its rights or remedies or realizing upon the Collateral; or (iv) seeking to modify any of the rights of Coral Capital provided for in this Interim Order.

b.      To the Other Lien Holders. The Other Lien Holders may assert interests in some portion of the Cash Collateral.  To the extent that any of the Other Lien Holders hold an interest in the Cash Collateral, as adequate protection for the Debtors' use of Cash Collateral pursuant to this Interim Order, each such Other Lien Holder to be granted (a) a replacement lien on all of the

15

Prepetition Collateral and the Postpetition Collateral and (b) a Superpriority Claim; provided, however, that such replacement liens and Superpriority Claims are to be only for the amount of any diminution in value (if any) of such Other Lien Holder's interest (if any) in the Cash Collateral and that such replacement liens or Superpriority Claim are to be only to the same validity, priority and extent of any pre-petition interest in the Cash Collateral held by such Other Lien Holder. The Other Lien Holders shall not be required to file any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office, or to take any other action in order to validate or perfect the replacement liens granted herein. The Other Lien Holders to have no right to seek or exercise any rights or remedies in respect of the replacements liens granted herein unless the Lender has consented thereto. The Debtors believe that the foregoing will adequately protect the Other Lien Holders interests in the Cash Collateral.

18. Pursuant to Bankruptcy Code § 363(f), the Debtors' sale of Receivables to Coral Capital in accordance with the Factoring Agreement shall be authorized and free and clear of all claims, liens and interests in such Receivables except to the extent of the rights and obligations set forth in the Factoring Agreement.

19. The Debtors request that the Court conduct a preliminary hearing on this Motion within five (5) days of the Petition Date and that the Court enter the Interim Order at that hearing.

20. <u>Notice of Final Hearing; Objections</u>. The Debtors propose the following notice procedure for the Final Hearing: on or before November 26, 2018, the Debtor shall transmit copies of a notice of the entry of the Interim Order, together with a copy of the proposed Final Order, to the parties having been given notice of the Interim Hearing, to any party which has filed prior to such date a request for notices with this Court and to counsel for the Official Committee of Unsecured Creditors, once appointed. The notice of entry of the Interim Order shall state that any

party in interest objecting to the Postpetition Financing on a final basis and the entry of the Final Order shall file written objections with the Clerk of the United States Bankruptcy Court for the District of Connecticut no later than 4:00 p.m. (prevailing Eastern Time) on November 5, 2018 and shall serve such objections so that the same are received on or before such date by: (a) Zeisler & Zeisler, P.C., 10 Middle Street, 15th Floor, Bridgeport , CT 06604 Attn: James Berman and Stephen M. Kindseth, counsel for the Debtors; and (c) the Office of the US Trustee.

22. Additionally, this Motion requests a final hearing for the authority to use Cash Collateral on or before November 7, 2018.

WHEREFORE, the Debtor respectively requests that this Court enter an Order granting (i) the preliminary and final relief sought herein and (ii) such further relief as this Court deems just and proper.

Respectfully submitted this 19th day of October, 2018, at Bridgeport, Connecticut.

        SERVICOM LLC,
        JNET COMMUNICATIONS LLC,
        and VITEL COMMUNICATIONS LLC

        THE DEBTORS

By:    */s/ Stephen M. Kindseth*
        James Berman (Federal Bar No. ct06027)
        Stephen M. Kindseth (Federal Bar No. ct14640)
        ZEISLER & ZEISLER, P.C.
        10 Middle Street, 15th Floor
        Bridgeport, CT  06605
        Tel. 203-368-4234
        Fax 203-367-9678
        Email: skindseth@zeislaw.com
               jberman@zeislaw.com
        Their Attorneys